### FERRIE *vs.* THE PUBLIC ADMINISTRATOR.

*In the matter of the Estate of* JEANNE DU LUX, *deceased.*

WHERE administration is claimed by a party as the son of the deceased, and his legitimacy is denied by the Public Administrator, no kindred intervening, proofs must be taken, and the question of interest determined. If reasonable doubts exist on the evidence, and there is a probability that further investigation will remove them, it is the duty of the Court to suspend sentence on the administration until an opportunity has been afforded to complete the examination.

Whether a decision on the administration would be conclusive on the distribution, provided new claimants should not appear,—*Quære?*

The alleged marriage of the intestate, and the birth of the person claiming as her son having occurred in France, and the proofs indicating a likelihood that more satisfactory evidence might be procured at the place of the domicil of the parties, at the date of the events in controversy, a commission was directed to issue for the purpose of instituting the proper inquiries relative to the relationship of the claimant and the intestate.

The *status* of the child is determined by the law in existence at the time of his birth, in the place of his birth, and of the domicil of his parents. By the law of France in the year 1800, majority was placed at 21 years, and the act of marriage was a simple declaration in the presence of the public officer and witnesses, by the parties, that they took each other in marriage. Marriages by minors without the consent of their parents, relations or neighbors, were declared invalid. No restriction was imposed upon persons of full age, unless they were relatives or bound by a previous contract, and thus the marriage of persons of full age depended upon the consent of the parties.

Marriage, in its origin, is a contract of natural law, and in civil society is a civil contract requiring no form or ceremonial, unless imposed by the local law, and even when the local law directs the ceremony to be conducted in a prescribed manner, a failure to comply with such forms does not affect the validity of the contract, unless such effect be expressly directed by statute.

Proof of the consent of the parties to the contract of marriage may be made in any way consonant with the ordinary course of justice.

Under the Code Napoleon, where there has been no act of public celebration inscribed on the registry, the legitimacy of the issue of deceased persons who lived publicly as husband and wife, cannot be contested under the single pretext of defect in the act of celebration, provided the legitimacy be proved by a possession of the *status*, and is not contradicted by the act of birth; and where the act of birth is wanting, reputation of legitimacy and of the parents' living as husband and wife is sufficient.

JAMES T. BRADY, *for Claimant.*

In determining a question of administration as to a child, the question of legitimacy is unimportant, and not to be considered. The word children in the statute, as there used, means all, whether legitimate or illegitimate. It clearly appears that the applicant is the son of the deceased intestate; and it also appears by her own declaration, that the decedent was married to the applicant's father. The proof of these declarations and the other facts in the case, raise the legal presumption that the marriage was in all respects legal and perfect, and that the issue of it was legitimate. (1 *Bradford, R.,* 506 ; 2 *Bradford, R.,* 424. 1 *Greenleaf Ev.* §§ 107, 27, 207.) To repel such presumption, there must be affirmatively established the want of some formality, which by the *lex loci,* made the marriage absolutely void. There is no such evidence in this case to rebut such presumption. The statutes of France which have been produced, do not impair the proof and the presumption of marriage, because they only provide at most, that a marriage formed contrary to the provisions of a certain title, shall be of no effect. It must be shown that the marriage in question was contracted against the provisions of that article, in order to invalidate it. The French law then existing, did not declare that non-registration should annul the marriage.

CHARLES O'CONOR, *for the Public Administrator.*

There are certain rules and presumptions of law in respect to the precise weight and value of each item of evidence.

These should be closely applied in a case affecting the civil *status.* The first impression from the evidence is, that this applicant was the decedent's son, and was illegitimate. The ordinary mind would draw this conclusion. She had a lover, who was afterwards her husband. She does not appear to be attached to any one but Ferrié, and she assumed maternal duties towards him. But her relation to him was covert, secret, and mysterious during a long period, without any conceivable motive, except that the relationship was ignominious and disgraceful. His occupation before he came here was not discreditable, and until he came, she did not know his deficiencies. She was born in 1777, and at the time of his birth could not have been less than thirty years of age. His age when she came to this country could not have touched her vanity. Down to her emigration to the United States, the case is marked with a negation of the relationship of parent and child. On the contrary, there is an unusual affirmation that he was her nephew. What was the motive? There were no special motives or relations calling for this, in case he was legitimate. Her intercourse with Du Lux is also another important consideration. Here is a long course of artifices and falsifications, and the denial of the legitimacy of her own son. Guilt is not to be presumed without evidence, if the circumstances can be accounted for on any other hypothesis. Legitimacy is presumed, unless the contrary appears. If a female have a child, marriage will be presumed. By the universal law the ordinance of marriage has some form. Cohabitation and reputation form the lowest grade of evidence—this cannot be dispensed with, except where there is no evidence whatever, and we are left to mere natural presumption, or where there is positive proof of the fact. Is the claimant excused from clearer evidence? Pedigree can be proved by reputation; his father was surrounded by relatives, and there is no obscurity on the side of either of his supposed parents. Is there proof of the fact? Her declarations are in evidence. Du Guerre first heard her speak of the boy in 1819 or 1820. She was speaking to the man who knew of her connection

with Du Lux, and who had given her worldly and prudential advice as to marriage, but who had not reprobated her conduct. He assumed she was married to Ferrié's father, but had he a right to do so? In the evidence of Grisier we have the testimony of a single witness, out of a great number, in opposition to every other circumstance and presumption. To De Guerre she said nothing about marriage, and he did not inquire, while to this comparative stranger she is made to say what was altogether unnecessary. To Burin she said she was married when very young, and had the child when she was very young, and yet Ferrié was born when she was from twenty-eight to thirty years of age. On her marriage with Du Lux she appeared under the name of Jeanne Icard, and not that of Ferrié. The wife's name is lost in that of the husband, according to prevailing usage. The affirmative proof is not only insufficient of itself, but the case abounds in positive negations of the supposed relation. If he is to be identified with the nephew spoken of in her correspondence, then down to 1819 or 1820, secrecy prevailed, and he was by her acts held out as her nephew. Neither she nor he stated any other relationship. All shows clandestinity—secrecy and publicity are important circumstances in determining the nature of the transaction. The suppression of the truth is a badge of fraud. Any motives for concealment from Du Lux which might have existed, disappeared on his decease. What mother would have left her child in this manner, unless under the influence of some strong motive? It was after the death of Du Lux she brought the child here. Instead of there being reputation of marriage, the contrary appears. Du Lux was her admirer when the child was born. The evidence disproves cohabitation. If she and all her friends knew Ferrié was her child, they all combined to deny it. This industrious repetition of his relationship as her nephew is not natural. It excites suspicion that the parties knew it was not true, and if they wished to conceal the real connection, what motive existed unless to hide a crime? Here was an industrious effort to gainsay her guilt, connected with

her constant representation of being a single woman till her marriage with Du Lux. Ferrié says he was recognized in his father's family. His birth was notorious. In order to screen herself from imputations, she ought to have assumed his father's name. She did not. Du Lux, in 1804, addressed her as Miss Jane Icard. Is it to be credited that she was then married to Ferrié? Her declarations are to be regarded with suspicion. She was not veracious. The case, on the part of the applicant, is rested altogether on the charitable presumptions of the law. They are not to be indulged when rebutted by the facts. Such presumptions are not allowed when negatived by the evidence, and the facts rebutting these presumptions cannot be overturned by proof of clandestine cohabitation, or by a solitary declaration of one of the parties. For the purposes of this argument, it is assumed the French law, in relation to the marriage contract, was the same as prevails in this State.

JAMES T. BRADY, *in reply.*

The opposing counsel has removed all questions as to the state of the French law existing at the time of the birth of Ferrié. If the decedent was married after majority, no form was necessary. The restriction as to form in the case of minors implies that persons of full age had a right to marry without any restriction. (4 *Kent's Com.*, 411. The Code Napoleon was promulgated 2d April, 1803 ; see §§ 756, 757, 758–765. *Merlin, tit. Bâtard.*) We must take the rules relating to the contract of marriage, and the evidence by which it is established, as recognized by the Common Law. Marriage is a question of fact. Publicity is not necessary. Marriage may be established by cohabitation, reputation, and acts of the parties. Marriage between deceased parties is not determined by any precise rule of evidence. (*Hubback, Ev. Succ.*, 241, 244, 250, 256.) The parties are good witnesses, and their declarations are admissible if they are deceased. The reason of the presumption in favor of legitimacy is the

good of society. Against the ordinary presumption in favor of marriage, circumstances must be proved inconsistent with that relation. Ferrié having been killed in an adventure with smugglers, she engaged the affections of Du Lux, who was in a superior condition of life, and it was her deliberate purpose to conceal the child from him—not from a sense of shame, but with views to another marriage. Nothing shows she was an unchaste woman. In the state of society then existing in France, a sense of shame would not have led her to conceal her relationship with the boy. As to her name, if she commenced her acquaintance with Du Lux as Jeanne Icard, she was ever afterwards bound to that name. Her mother was married by her maiden name, though a widow. But suppose the reason for the concealment cannot be discovered; that circumstance alone is not sufficient to repel the presumption of law, and the inferences to be drawn from the facts in connection with her own declarations, that Ferrié was her son, and that she was married to his father.

THE SURROGATE.—Jeanne Du Lux recently died in this city, leaving a large estate, probably exceeding $100,000 in value. John P. Ferrié has applied for letters of administration, claiming as her son or her nephew, and the Public Administrator and the French Consul intervene in contestation.

The decedent was a native of Pau, Province of Bearn, in France, and was born November 24th, 1777, being the daughter of John Icard and Magdalene Rivière. Her mother was first married to Antoine Dezeille, by whom she had a son, named Benoit.

By her second marriage, she had Jeanne, and a son named Paul Alexis. John Icard, the father, died in 1785; and his widow probably did not long survive him.

After the decease of her parents, we find Jeanne Icard at Massat, Castillon, and St. Girons, places all in the vicinity of Biert, her mother's original domicil, and where an uncle and cousins, Rivière, maternal relatives, still resided. Her bro-

thers entered the Revolutionary army, and from the correspondence of one of them, she appears, in 1797 and in 1800, to have been living at the house of citizen Anere, a merchant of St. Girons, Department L'Arriège. At this place, and about this period, occurred her marriage with Ferrié, and the birth of the applicant—if the latter be, in fact, her legitimate son. The child was put to nurse with country people, and shortly after, Ferrié, the alleged father, was found dead by the roadside—murdered. Jeanne next appears at Toulouse, with an aunt—Catharine La Croix—and again at Bordeaux, in the house of Catelan, a silk merchant, where she became acquainted with Henry Du Lux, her future husband, then a clerk with Catelan & Brothers. Nothing transpires in regard to the boy until many years afterwards.

In the month of May, 1806, the decedent came to the City of New York, engaged in business, and resided here until her decease. She lived with Du Lux, and, judging from the address of a letter in 1808, passed by his name. By the advice of a friend they were formally married on the 17th June, 1812, and Du Lux immediately proceeded to Bordeaux. He returned to the United States in 1813, and in the summer of 1814, again left for his native country. The last letter to his wife that appears, is dated at Paris, in December, 1814, in which he states that her neglect in not honoring one of his obligations would prevent his return to New York. A cloud hung over his course from that time until 1822, when he communicated with M. Du Guerre, of this city, from the Isle of France, and since that period no further intelligence was received.

The fate of Alexis, one of the decedent's brothers, who entered the French army, was in uncertainty as early as 1796, when it formed a subject of inquiry in the letters of his surviving brother, Benoit. The latter, who assumed the name of Rivière, continued in active service—rose to the rank of Captain, and accompanied the unfortunate expedition of Le Clerc to St. Domingo, in 1801, where undoubtedly

he perished.   Upon this state of facts, the death of the decedent's husband and two brothers will be presumed.

To return to Ferrié, who had been left, since his birth, in the Pyrenees:

Du Lux, on his arrival at Bordeaux, in 1812, immediately instituted an investigation at the solicitation of his wife : In a letter to her, dated in August, he says : " I have written twice to St. Girons, and have not received any news.   Believe, nevertheless, that the address which you gave me is the one which I sent."

In September, he informs her, " They have written to me from St. Girons ; I hope to have another letter before leaving, which will, perhaps, enable you to receive good news from me."   And again :  " Anere has replied to me that he is going to make a thorough investigation himself—that he lived eight leagues from the village.   On my arrival thou wilt probably know what to believe about it."   And yet again :  " There is nothing positive to acquaint thee with about the fate of thy nephew."

Whether more definite information was received through Anere is uncertain ; at any rate, nothing further transpires until the year 1815, when Madame Du Lux proceeded to France.   She visited Bordeaux and St. Girons, and finally succeeded, in person, in discovering Ferrié.

Ferrié's story is, that his first recollections were of living in the mountains,—the Lower Pyrenees, with country people, where he continued until Madame Du Lux made her appearance and claimed him.   He states: " She said, this is my son. I come to fetch him.   She said she had paid a great deal of money, and did not appear to be pleased with the way I looked.   She took me away with her."

Madame Du Lux proceeded with Ferrié to Bordeaux, and having placed him at school, left for Paris.   A night or two succeeding his arrival, Ferrié escaped and made his way back to the mountains, and after setting on foot another search for the boy, Madame Du Lux returned to New York.

He, meanwhile, was discovered, brought to St. Girons, and

placed with Anere, who consented to take charge of his education. He there remained until 1821, when Madame Du Lux, having received no intelligence of him for several years, though Anere was supplied with funds through Catelan of Bordeaux, her suspicions were excited that he was dead, and a travelling agent was commissioned by Catelan to make inquiries at St. Girons. The boy was found, clothed in rags, employed as a servant, and his education greatly neglected. He was then sent to Bordeaux, and remained in charge of M. Catelan until April, 1824, when, to escape the conscription to which he would have been exposed by asking for a passport, he was secretly conveyed to a vessel lying off Bordeaux, and brought to America. He lived with Madame Du Lux some time; but disagreements soon broke out between them, and they separated. Ferrié ultimately established himself as a hair-dresser at Cincinnati; he corresponded occasionally with the decedent, and visited her several times at New York; and thus matters continued until she met with a fatal accident, and came to her end at the Hospital of the Sisters of Mercy.

Was Ferrié the nephew or the son of Mde. Du Lux? One of the most remarkable features of this extraordinary case is the care and fidelity with which correspondence and documents have been preserved—some of them reaching as far back as 1778. Over one hundred and fifty letters and papers are before me, containing the history of the parties; and if anything can be established by repeated, consistent, and uniform assertion in writing for over forty years, there could be no possible doubt that Ferrié was the nephew of the decedent.

But, on the other hand, there is no satisfactory evidence that Mde. Du Lux ever had a sister, or that either of her brothers was married. And then, in addition, we have very clear proof from a number of respectable and unimpeached witnesses, that the decedent frequently, in conversation, declared that Ferrié was her son, and addressed him as her son.

Anthony Marriot says: "Ferrié called her mother. When I met her, she asked me sometimes how is Ferrié, and sometimes how is my son."

John T. Bernard says: "I have heard Mde. Du Lux speak of Ferrié; she sometimes spoke of business, sometimes of her son; she asked how was her son, had I seen him lately. She always called him her son—never called him nephew."

William Dibblee says: "I have heard her say that son of hers was a wild chap, and that she could do nothing with him. I have heard her mention him as her nephew, but I took it as a whim of hers, knowing she was very eccentric; I should think she spoke most frequently of him as her son. She said her son was a wild fellow, and she could do nothing with him; she said, in speaking to other people, she wished her son Ferrié was as smart a boy as I was."

Hannah J. Froehlich says: "I have heard Mde. Du Lux speak of him sometimes as her son, and sometimes as her nephew."

Dorothea Du Fau, acquainted with the decedent 34 years ago, states: "That in 1823 Mde. Du Lux showed her a handful of gold, saying that she was going to send it to Bordeaux for her son. She said the father of that young man was dead; she did not say anything about her husband in France; she told me that his father died on the road between Toulouse and Spain; that he dealt in horses and mules; that he was killed, selling mules; she said he was killed on the road."

Axianne Frevall testifies: "That Mde. Du Lux frequently visited her house; that on one occasion, speaking about her property, and about making her will, she said, 'That she had a nephew named Ferrié who lived in Cincinnati;' my husband said he did not know that she had any relatives here; she said, 'Yes, as the world goes, they say he is my son;' my husband said if he was her son, it was a shame for any woman to deny it; she said it was a shame; that he had offended her, and she called him her nephew; my husband said, 'But will you be able to prove that?' she said, 'There

are enough witnesses—they could apply to M. Du Guerre, who knew all about him;' she said she did not mean to leave all to him; but, at the same time, if she did die without a will, he was the only person belonging to her, and the only one to claim it."

Julia Baurans, who lived about three years in the same house with the deceased, states as follows: "She said she had never had but one child, and that was a boy; that she had him in France; she said she left him at a nurse's in France when she came over." * * "She said when she came to my house, that Mr. Ferrié was her son, and she looked very much excited." * * "She told me she had brought him from where he was at nurse, and brought him to a hatter at Bordeaux; that he was born at a place called St. Girons." * * "When she told me he was her son, I asked why she called him her nephew; she said because he was disobedient to her."

Mary Riley says: "I have frequently heard her speak of Mr. Ferrié as her nephew; I heard her say, when he was on here two or three years ago, that after he went back to Cincinnati, he wrote letters to her asking for money, and in one of those letters she was addressed as his mother." * * "I spoke to her of the necessity of arranging her business, and making her last will; and I said, 'If you do not do so, the Public Administrator will come in and take possession of all your effects and property.' She seemed very indignant at my expression, and said, in a very determined manner, 'No; my nephew from Cincinnati will come here and take possession of all.' When the conversation turned upon making a will, she always mentioned Mr. Ferrié as her heir."

Ann Creighton knew the decedent 25 years. She testifies: "I knew M. Ferrié; Mde. Du Lux has frequently talked with me about M. Ferrié; she thought he was ungrateful for all the kindness she had done for him, and taking a mother's care of him; she said she had one child when she was quite young; she said she was married very young, and this child born about fifteen; she said the child was a boy, born in

France, before she came to this country." * * "When she spoke of her marriage, she referred to M. Du Lux; she said she was married in New York. She said she was very young, about fourteen or fifteen, when her son was born; she never spoke of Ferrié as her son; she said she lost her son about that time; I understood her he was dead; that this Ferrié was her nephew."

. Henry Martin, who became acquainted with Mde. Du Lux in 1824, says: "Sometimes she spoke of Ferrié as 'my son;' more often 'my son;' sometimes 'my nephew;' sometimes, when very angry, she would say he was not her son." * * "She told me Ferrié was born in her native place; she never said how old he was, or whether she was married when he was born." * * "I was speaking to her of the same accent that she and Ferrié had; she said, 'Oh, yes, we were born in the same province in France;' I said to her, 'Oh, he is your son—he has the same voice and expression;' she said, 'Everybody says he looks like me—of course he is my son.'"

Madeline Grieser hired apartments of Mde. Du Lux, and testifies to a very recent conversation with her. She says: "I have two children; I had a conversation with her about children; she did not like to have children in the house; I said: 'You never got children.' 'Oh, yes, you are mistaken, —I had one in France, when I was very young.' She said, 'I had to send money to support him when he was at nurse;' she asked me if 'I was married in this country or in France;' I said 'I was married in France;' she said, 'I was married in France, too, in the Revolution times;' 'she said to me she was married very young, and she had the child when she was very young, too; as that was the case, she had no more.'" "She said she sent money to France for her son." "When she was sick in bed, the last time, she said she was married in France, in the time of the Revolution, and married to Du Lux in this country."

M. Du Guerre, who became acquainted with Madame Du Lux when she first came to this country, says: "I have heard Madame Du Lux speak of her son; I first heard her speak

of him when she was going to France to bring him over here. This was after Du Lux went away, about 1819 or 1820. I never heard her speak of her nephew or son before that; she told me 'I cannot call him my son—that fellow looks too old.'" "She sent money to Bordeaux to school him; he was living in the country, in the mountains, about twenty miles from Toulouse; she said she was going to France to bring her son; she said that his father was killed by the smugglers on the frontiers of Spain—that she had nursed him herself—that his father was killed when the boy was quite young; I took it for granted that she was married; she did not say, and I did not ask her whether she was married; this was after Du Lux left; after Ferrié came, she said she could not call him her son—he made her look too old." "She told me she went up the mountains herself and got the boy, and brought him to Bordeaux—that he was wild—lived among the goats —that he ran away from Bordeaux and went back to the mountains; she told Catelan to put him to some trade; he put him to a hatter's; Catelan was her agent; she left him at Bordeaux to be educated; he was so wild he could hardly speak any French when she brought him to Bordeaux." "She told me herself, that Ferrié's father had died when he, Ferrié, was quite a child, which was before she went to Catelan's at Bordeaux."

Elizabeth Cropsey testified that "the decedent informed her she had a nephew in Cincinnati; but sometimes spoke of him as her son."

Mary Morrison says the decedent "always said she had a nephew; said she had one child, a little boy; she never mentioned its father; never heard her talk of any person but Du Lux as her husband; she said Du Lux was its father—that the child was given to a nurse in France, and died when very young." * * * "She also showed me some baby-clothes, and some gentlemen's clothes—said some were her nephew's and some were M. Du Lux's, in the trunk; said the baby-clothes were the clothes of the child she had lost; from the appearance of the clothes, they belonged to a very young

child; she said she had a sister in France who died and left two children—a boy and a girl—that she took the children, and took the nephew when he was thirteen years old; she said the niece had died; she said she had an uncle—a doctor. She spoke of a brother, said he was dead." "She said she came from France when sixteen or seventeen years old, and that she and Du Lux were not married in France—there was a revolution then—that she gave the child she had in France to a bad nurse, and it died."

Many of these statements are inconsistent with facts otherwise proved; but others are in entire harmony with the leading outlines of the case, a coincidence which could not be accidental, and which increases largely their claim to credence.

Only one of the witnesses affords any ground for suspecting that Ferrié was the decedent's nephew, by a deceased sister.

The deep interest Mde. Du Lux took in the welfare of the child, the large expense she incurred for his maintenance and education, indicating in a person of her miserly disposition very profound sentiments; the striking likeness existing between them, and the declarations she repeatedly made, through a long course of years, to various intimates, would seem to leave no reasonable doubt that he was her son.

Indeed, we cannot read her correspondence without remarking the expression of feelings far more intense than would ordinarily exist on the part of an aunt to a nephew. If he was her nephew, why is it that not a syllable ever escapes, in the letters between her and Catelan and Ferrié, as to his parents? Why is there an utter blank silence in regard to the circumstances under which he had been left to the care of his aunt? How was it that *she* had placed him at nurse,—that she alone could find him when the efforts of others had failed; that she left her home and business; crossed the Atlantic, and sought him where he had been deposited in infancy, and, with all a mother's care, provided for his future training and education?

But, then, on the other hand, if he was her son, why was

he, in all the correspondence, so industriously represented as her nephew? That this was begun for the purpose of concealment from Du Lux, I cannot believe; for if Ferrié was not her nephew, Du Lux must have known it. As early as 1804 his letters show he was aware of the disappearance of her brothers Alexis and Riviére. When he went to France, in 1812, after his marriage, he instituted inquiries about Ferrié, using for that purpose the address of some person at St. Girons, probably that of M. Anere, and that address was given him by his wife herself. Is it possible that Mde. Du Lux should have endeavored to palm off the boy upon her husband, as her nephew, when she knew that at a glance he must perceive the false pretence; or would she have requested him to make investigations at the place of his birth, if she had wished to conceal their real relationship—putting into her husband's hand the very clue to the dreaded exposure. And her language to Du Lux while at Mauritius in 1822, indicates the expectation that Du Lux and Ferrié would meet, and expresses a tender interest in Ferrié's welfare, in which she looks for the sympathy of her husband. She says, "I beg of thee to take care of him, after my death. Tell him I have suffered much for his sake, and for thine." Are these the words of a mother committing the offspring of her shame to the care of her husband?

Again: it is urged that in the act of marriage with Du Lux in 1812, the decedent was described by her maiden name, Jeanne Icard; but this is not conclusive, for the same fact occurred on the second marriage of the decedent's mother, who, in her act of marriage, was represented as Magdalen Riviére, and not as the widow of Antoine Dezeille. If it be said that the decedent, in all her correspondence with Lieutenant Riviére, her brother, and with Du Lux, in 1803 and 1804, was always addressed as Jeanne Icard, it is not to be overlooked that there is a period, from 1798 to 1800, presenting a gap in the correspondence quite long enough for the events of her married life, as she recounted them. And if what she stated to Ferrié be true, it was quite

possible that she had no desire to continue the memory of a connection of which she did not regret the calamitous termination. Ferrié declares: "She said she did not like my father because he did not see me often enough while I was at nurse; that he was a rough kind of man, and did not treat her very well; my father's name was Ferrié—I suppose John P. Ferrié; I never asked my mother whether she was married to him; she told me she was glad he was killed; that he was not much loss; he was trading in mules from France to Spain; he was a tanner, too; was killed by Spaniards; had plenty of money, and was found killed along the roadside; she was living then at St. Girons." "My mother said, she and my father took me to the nurse and left me there; that she went almost every week to see me, but he only two or three times; I was, probably, seven or eight months old when he died; she did not say how she was married; I never could ask her any questions on the subject; she would not talk with me; she was too quick; my father had a brother living at St. Girons named Ferrié; his business was that of a tanner; all the Ferriés are tanners there; when I was baptized, my godfather was my father's brother; his name was Ferrié; I think my godmother was some relation to my father's family; I was baptized at St. Girons; my mother put me out to nurse, because, I suppose, she had to work; sometimes she lived at Ferrié's father's—my grandfather—at St. Girons, I presume." "When I ran away from Bordeaux, I went back to St. Girons and saw my relations; I saw my uncle; they knew who I was; I went to the nurse's, the country people I lived with."

Soon after the decease of her first husband, if she were married to Ferrié, the decedent became acquainted with Du Lux, and their letters show they were on terms of the closest intimacy. Probably her previous obscure marriage and the birth of a child would not have increased her claims to his interest. If she had then already dropped her name of Ferrié from motives of indifference, or in the expectation that the chances of another settlement might thus be promoted,

the real state of facts may have remained undisclosed until after her marriage with Du Lux; and even then the long concealment that had occurred might lead to the public acknowledgment of the boy, not as her child, but as a collateral relative. Certain it is that, until after the marriage in 1812, the documentary proof does not exhibit his existence.

I cannot deduce from these facts that Ferrié was an illegitimate son of the deceased. It does not appear that, during the period of her supposed connection with his father, she did not bear his name; and when that connection was terminated, and as Jeanne Icard she had found her way, in a strange city, to a higher class of associates, and was encouraging the addresses of a lover, the mere fact that she had at first assumed the position of a maiden, may have led to the continuance of the deception. At any rate, the probability of the existence of other motives for her course is not so clearly excluded, that we are compelled to attribute her conduct to· previous unchastity. Clandestinity excites suspicion; but mere concealment, where the motive cannot be traced out and laid bare, is not alone sufficient to stamp the suppressed fact as properly shameful in itself. Truth and justice often suffer from a false sense of pride, from vanity and selfishness.

Whether Ferrié was the nephew of Madame Du Lux, or her son, legitimate or illegitimate, it was unnatural to abandon him for twelve years to the care of strangers, to grow up among goat-herds in the wilds of the Pyrenees, hardly able to speak his native tongue. Although we may not be able to penetrate the inducement to this conduct, I do not think it points so clearly to his illegitimacy as to compel us to that conclusion. Nor does the supposed intimacy of the decedent with Du Lux before their departure for America reflect much light on the nature of her previous connection with Ferrié. In a doubtful case, general lewdness is a material element in causes of this character, but it loses its importance as it departs in time from the transaction which is the subject of inquiry. There is, however, not only no evidence of that kind before me, but I am not prepared to say that previous to the

formal ceremonial of marriage in 1812, Du Lux and the decedent were not man and wife according to our law. That she passed as his wife in 1808, appears from a letter of that date, addressed to her as Mde. Du Lux, and in which the writer desires to be remembered to " her husband ;" and that a formal marriage does not exclude the establishment of a previous marriage in fact, is determined by the decision of the Supreme Court of this State, in the case of *Starr* vs. *Peck,* 1 *Hill,* 270.

In considering the question of Ferrié's legitimacy, the date of his birth is a point of moment as determining the law then existing in relation to marriage and birth. The statements of Madame Du Lux as to her own age at the time he was born cannot be relied on, for she seems at all times sedulously determined to make herself out as young as possible. In the act of marriage with Du Lux, in 1812, she is described as thirty-two years of age, when she was thirty-five. I attach no importance to her statements, made to a number of persons, that she was " very young," thirteen, fourteen or fifteen, when the child was born, for such a date would make Ferrié to have been, at least, twenty-three years old at the time she brought him from the Pyrenees, when he was confessedly still a lad. On the other hand, Mrs. Frochlich, who was acquainted with Madame Du Lux several years before Ferrié came to this country in 1824, says that she lived in the house of the decedent, and was present when Ferrié arrived ; and that shortly after his arrival, Madame Du Lux told her " he was twenty-four years of age." Ferrié himself says that the decedent told him, two or three years ago, that he was fifty-one years old. In the draft of a letter from her to Ferrié, written in 1846 or 1847, as I judge, she tells him, " remember, you are forty-seven years old." These statements correspond with the declaration made to Mrs. Frochlich in 1824, and have a very clear verification from an independent source, in a letter of M. Anere, dated St. Girons, Nov. 29, 1818—in which, referring to the choice of a profession, he says : " It is time to make a decision, as he approaches his eighteenth

year." Now, it appears from her correspondence with her brother, Lieutenant Rivière, that in 1797 and in 1800 she was living at the house of citizen Anere, at St. Girons; and this is the place, according to Ferrié, and M. Du Guerre, where Ferrié was born. It was to Anere M. Du Lux applied, in 1812, when endeavoring to discover the fate of Ferrié; and it was with Anere, Ferrié was placed, in 1815, when at last discovered by Madame Du Lux in the mountains. I conclude from these facts that Ferrié was born about the year 1800.

His *status* must be determined by the law then in existence, which was the Act of the National Assembly, passed 20th September, 1792, and which continued in force until the decree of Napoleon, March, 1803.

By the Act of the National Assembly, majority was placed at twenty-one years, and the act of marriage was a simple declaration, in the presence of the public officer and witnesses, by the parties that they took each other in marriage. Marriages of minors, without the consent of their parents, relations or neighbors, were declared void; but marriages consummated without the formalities prescribed by that act, by persons of full age, were not declared invalid. The XVth title regulates "the qualities and conditions requisite for one to be able to contract marriage;" and no restriction is imposed upon persons of full age, unless they were relatives, or bound by a previous contract.

Although it was declared that the National Assembly did not intend to interfere with the liberty of the citizen in consecrating births, deaths and marriages with religious ceremonies, yet such were left to the option of the parties, all laws inconsistent with the act being abrogated.

This would leave the contract of marriage, in respect to its validity, dependent upon the simple consent of the parties. Marriage, in its origin, is a contract of natural law, and in civil society is a civil contract, requiring no form or ceremonial unless imposed by the local law—and hence, when the law directs the ceremony to be conducted in a prescribed

manner, a failure to comply with such forms does not affect the validity of the contract, unless such effect be expressly directed by statute. If, then, the decedent was married to Ferrié's father, and the contract was made before the adoption of the Code Napoleon in 1803, a simple consent by the parties was all that was intrinsically necessary to the validity of the marriage, and that consent can be proved in any way consonant with the ordinary course of justice. Even under the Code where there has been no act of public celebration inscribed on the registry, the legitimacy of the issue of deceased persons who lived publicly as husband and wife, cannot be contested under the single pretext of defect in the act of celebration, provided the legitimacy be proved by a possession of the *status*, and is not contradicted by the act of birth. And when the act of birth is wanting, reputation of legitimacy and of the parents living as husband and wife is sufficient. (*Les cinq Codes annotés—par J. B. Sirey, p.* 52).

The proof of the marriage of Ferrié's parents depends not upon any technical rule of evidence, but upon those principles which all courts invoke for the purpose of ascertaining the truth.

While it is not to be overlooked, that we are not in possession of the acts of celebration of marriage, or of the birth of Ferrié, according to the system of registry then existing in France, too much weight should not be given to this circumstance, if we take into view the state of disorder, political and social, at that time prevailing, and especially the lax ideas in respect to the sanctity of marriage. It was not necessary there should be any religious ceremony, and parties of humble condition had no great inducement to go through the forms, and encounter the expense of public registration.

I have entered into a detail of the various points of this interesting and singular case, mainly for the purpose of indicating the particulars to which future investigation should be directed; for, in the present condition of the evidence, I cannot but think a decision at this time would be premature. Were it clear that all the light possibly to be obtained had

been thrown upon this subject, or had an opportunity been afforded for close and accurate inquiry, my simple duty would be to pronounce a decision; but while the testimony thus far has been confined to sources at home, it is obvious that a much richer field may be opened abroad, and instead of being left to form a judgment from inferences and presumptions, we might attain a conclusion entirely satisfactory. It may be that no means can be found to lift up the veil of mystery enveloping these transactions, and that all traces have been obliterated save those preserved by Madame Du Lux herself; but it would be wrong to take that for granted, instead of instituting the proper examination.

If it be said that a decision on the administration would not be final on the distribution, I am not so clear on that point, provided no other claimants should appear than the present parties. In any event, it would be unwise to lay the ground for such an embarrassment. The possibility, too, that other claimants may intervene hereafter, and compel a trial of the case *de novo*, increases the reasons for making a thorough investigation in the first instance, so that the sentence pronounced on administration may be based upon as full and complete a knowledge as possible.

A commission must, therefore, issue for the purpose of instituting the proper inquiries to ascertain the relationship of Ferrié with the decedent. St. Girons is the point where the investigation can probably be conducted with the greatest advantage. Evidence may be taken also at Massat, Biert, Castillon and Bordeaux. Meanwhile all further proceedings must be stayed, except so far as may be necessary for the preservation of the estate.