Dyer v. Brannock.

DYER *et al.*, *Plaintiffs in Error*, v. BRANNOCK *et al.*

1. **What Constitutes a valid Marriage.** An agreement made in 1819 or in 1830, between parties competent to contract, that they would live together as man and wife, followed by actual cohabitation, constituted a valid marriage, without solemnization before a minister of the gospel or an officer of the law. The Territorial Laws of April 24th, 1805 and July 9th, 1806, (Terr. Laws, pp. 66, 83), and the

act of the Legislature of January 4th, 1825, (Rev. Stat., 1825, p. 527), concerning marriage, contain no positive declaration that a marriage not so solemnized shall be void.

2.  **Unlawful Marriage:** INHERITABLE CAPACITY OF ISSUE. Under section 8 p. 328, Rev. Stat. 1825, which provides that the issue of all marriages deemed null in law  *  *  shall, nevertheless, be legitimate, a child of such a marriage will inherit and transmit by descent the same as if born of a lawful marriage.

3.  **Statute of Limitations.** As against the heir of a married woman whose husband survives her and is entitled to an estate in her lands as tenant by the courtesy, the statute of limitation runs from the expiration of his estate and not from her death.

*Error to St. Louis Court of Appeals.*

The case is reported in 2 Mo. App., 432.   Ejectment to recover several lots in the city of St. Louis.   The opinion states the case.

*Pope and Randall* for plaintiff in error.

1.  There was a marriage between Wilson and Sarah Ann Adams in 1824, unless the evidence proves a marriage between Wilson and Jane Collins in 1819.   If the latter marriage is proved, then the former is "deemed null in law," but under the statute the issue is nevertheless legitimate.   *Lincecum v. Lincecum*, 3 Mo. 441 ; *Stones v. Keeling*, 5 Call 143 ; *Graham v. Bennett*, 2 Cal. 506 ; *Johnson v. Johnson*, 30 Mo. 72 ; *Buchanan v. Harvey*, 35 Mo. 276.

2.  Though the evidence may not prove a marriage in 1819 between Wilson and Jane Collins, yet there is proof of a marriage between them in 1830, which was valid though not solemnized according to the statute.   Burns' Ecc. Law, *title* marriage, 488 ; *Morris v. Miller*, 1 Wm. Bl. 632 ; 4 Burr. 2057; *St. Devereux v. Much Dew Church*, 1 Wm. Bl. 367 ; *State v. Britton*, 4 McCord 256 ; *Jackson v. Winne*, 7 Wend. 47 ; *Fenton v. Reed*, 4 Johns. 52 ; *Taylor v. Robinson*, 29 Me. 323 ; 2 Greenl. Ev. §§ 460, 462 ; 2 Stark. Ev. 939 ; 1 Phil. Ev. (4 Am. Ed.) 631 ; *Richard v. Brehm*, 73 Penn. St. 140 ; *Bissell v. Bissell*, 55 Barb. 325 ; *Clayton*

*v. Wardell,* 4 N. Y. 230; *Boatman v. Curry,* 25 Mo. 433; *Grotgen v. Grotgen,* 3 Bradf. 373; *Tumalty v. Tumalty,* Ib. 369; 2 Dane's Abridg. 297; *Cargile v. Wood,* 63 Mo. 501.

3.   A marriage in Missouri in 1830 was valid if had by the mutual present consent of two competent persons, made in good faith and followed by cohabitation, without the addition of any prescribed formalities, and may be shown by such evidence as proves that such a marriage actually exists.   *Dalrymple v. Dalrymple,* 2 Hagg. Con. 61; 1 Bl. Com. 433, 440, note 26; Taylor on Civil Law, p. 301. *et seq.;* 2 Dane's Abr. 290, 297; *Read v. Passer,* 1 Esp. 213; *Leader v. Barry,* Id. 353; *Lindo v. Belisario,* 1 Hagg. Con. 216, 230; *Hayden v. Gould,* 1 Salk. 119; *McAdam v. Walker,* 1 Dow 148, 181, *et seq.; King v. Brampton,* 10 East. 282; *Bunting v. Lepingwell,* 4 Coke 29; *Holt v. Ward,* 2 Strange 937; Burns' Ecc. Law, *title* marriage 457; *Queen v. Millis,* 10 Cl. & F. 534, 703, 785; *Latour v. Teesdale,* 8 Taunt. 837; *Scrimshire v. Scrimshire,* 2 Hagg. Con. 395; *Fenton v. Reed,* 4 Johns. 52; *Nathan's Case,* 2 Brews. (Penn.) 149; *Ferrie v. DuLux,* 3 Bradf. 151; *Cheseldine v. Brewer,* 1 H. & McH. 152; *Carijolle v. Ferrie,* 26 Barb. 177; *Van Tuyl v. Van Tuyl,* 57 Barb. 235.

4.   The doctrine has become established that a marriage good at the common law is good notwithstanding the existence of any statute on the subject, *unless the statute contains express words of nullity.*   Bishop on M. & D., 1 Vol., § 283; 2 Greenl. Ev., §§ 460, 462; *Ferrie v. DuLux,* 3 Bradf. 151; Reeves' Dom. Rel., 196, 200, 290; 2 Kent's Com., 90; *Pearson v. Howey,* 11 N. J. 12, 19; *Londonderry v. Chester,* 2 N. H. 268; *Rodebaugh v. Sanks,* 2 Watts (Penn.) 9; *Parton v. Hervey,* 1 Gray 119; *Milford v. Worcester* 7 Mass. 48, 55; *Carmichael v. State,* 12 Ohio St. 553; Physick's Estate, 4 Am. Law Reg. (N. S.) 418; *Senser v. Bower,* 1 Penn. 432, 450; *Cargile v. Wood,* 63 Mo. 501.

5.   There is not, and never has been, a statutory provision in Missouri, making void a marriage not conforming to the statutory provision for solemnizing marriages.

6. The plaintiffs were precluded by the life estate from an immediate right of entry or right of action, and their rights did not accrue to them, and the statute did not run against them, until the termination of this estate: It was suspended as to them during the existence of the life estate. Angell on Lim., (5 Ed.,) § 483, p. 483; *Carr v. Dings,* 54 Mo. 95; *Salmon v. Davis,* 29 Mo. 176; *Marple v. Meyers,* 12 Penn. St. 122; *Clark v. Vaugham,* 3 Conn. 191; *Heath v. White,* 5 Conn. 228; *Jackson v. Schoonmaker,* 4 Johns. 390; *Jackson v. Sellick,* 8 Johns. 262; *Jackson v. Johnson,* 5 Cowen 74; *McCorry v. King,* 3 Humph. 267; *Guion v. Anderson,* 8 Humph. 298, 324; *Miller v. Ewing,* 6 Cush. 34; *Tilson v. Thompson,* 10 Pick. 359; *Wells v. Price,* 9 Mass. 508.

*Cline Jamison & Day* for respondents.

1. It is not contended that any marriage was ever solemnized between Collins and Wilson at any time, as required by statute laws in force during the times they lived and cohabited together. They were both of the age of consent; they claimed to have contracted and cohabited together during life; but the testimony of Collins herself furnishes positive proof that no ceremony of any kind, as required by law, was ever had between them, so that this cannot be inferred or presumed to have been a marriage as a matter of inferential proof from the way they treated each other or their child, Cynthia Elizabeth, who is claimed to be the offspring of this commerce.

This marriage is neither a legal marriage, nor is it a marriage " deemed null in law." It is simply no marriage at all, nor do we see how it can be claimed that its off-spring can inherit the lands of Wilson, the father, if he had any at the time of his death. Our claim is, that this pretended marriage is either a good and valid marriage, or it is no marriage at all; if good and valid, then it could only be dissolved by death or divorce. If it be no marriage,

then it cannot be a marriage " deemed null in the law," as that phrase in the statute has a legal signification, and comprehends that class of marriages duly solemnized in accordance with the requirements of the law; but, owing to some defect, disability, or deceit of one or both of the parties to the contract, the law deems the marriage null and void, but respects the innocent issue as legitimate. This law was designed to protect the issue of bigamous and polygamous marriages, or marriages that may have been solemnized between parties disabled by law from marrying each other. It is plain the Legislature has never gone so far as to permit parties to enter into the married relation in this State without complying with the law of ceremonies. Nor have our courts ever undertaken to legitimize the product of illicit commerce of the sexes, no matter how able or willing they were to contract marriage with each other, unless that contract was entered into under the forms required by the statute. Under this view, Wilson and Collins were not married. Their connection with each other was illicit. The offspring was a bastard. There was no marriage, and they were liable to a criminal prosecution under the statutes in force at the time.

2. If it be held that marriage could be entered into without solemnization, then the plaintiffs have no title to the land, as this doctrine necessarily conveys with it the need of a judicial divorce to absolve Wilson from this marriage before he would be capable of entering into a lawful marriage with Sarah Ann Adams, and the issue of that cohabitation would be rendered incapable of transmitting an inheritance to its bigamous father. In this case the child of Wilson and Adams could inherit from both parents, but neither parent could inherit from the bigamous child. *Guardians of the Poor v. Nathans*, 2 Brewer (Pa.) 149.

3. This action is barred by the statute of limitations, because more than three years elapsed after the death of

Cynthia Elizabeth Dyer before this suit was begun.    Wag. Stat., § 4, p. 916 ; *Smith v. Burtis,* 9 Johns. 181; *Demarest v. Wynkoop,* 3 Johns. Ch. 129 ; *Doe, etc. v. Jesson,* 6 East 80 ; *Bush v. Bradley,* 4 Day 298 ; *Bunce v. Wolcot,* 2 Conn. 27 ; *Doe v. Jones* 4 T. R. 300 ; *Stowell v. Zouch,* Plowd. 353.

NAPTON, J.—The two principal questions involved in this case, are : First, whether the observance of the statutory forms prescribed for the celebration or solemnization of marriages, under our territorial government in 1819, or subsequently under the State government in 1830, was essential to a valid marriage; and second, the construction of our statutes of limitation, as applied to the facts in evidence.

In order to show the pertinency of the instructions to the evidence submitted, we will here state the main facts which that evidence tended to establish; whether to the satisfaction of the jury or not, it is not important to inquire.

The land in controversy is a part of the Motard tract, which passed at an early date to Culver Adams, and through him to his three children, David, James and Sarah Ann Adams, and upon a partition in 1838, the one-third which had belonged to Sarah Ann was set apart to the unknown heirs of Zachariah Wilson, from whom the plaintiff claim.

Zachariah Wilson was a river pilot in 1819, and one Mrs. Collins, a widow, at that time kept a boarding house in St. Louis. There was evidence to show that Wilson and Jane Collins, the daughter of Mrs. Collins, and then about 19 years old, on the 24th August, 1819, about 10 o'clock at night, declared their intention, in the presence of the mother and brothers of Jane, and several boarders who were present, to live together as husband and wife. There was no magistrate or other person authorized by the statutes of the Territory to celebrate marriage rites present on the occasion, but they stood up on the floor of the sitting room, or most public room in the house, side by

side, with joined hands, and it was announced to those present by the mother or brother of Jane, that she and Wilson had agreed to marry, to which they both assented by an inclination of the head. They then retired to a bed-room and cohabited together as man and wife for three weeks. When Major Long reached St. Louis on his expedition to the Rocky Mountain, Wilson joined the expedition. The result of this cohabitation was a daughter named Cynthia Elizabeth, from whom plaintiff's title is derived.

It was understood, on the departure of Wilson, that Mrs. Collins should take care of Jane, and that he would, when opportunity presented, remit some money to support her during his absence, which he occasionally did. Meanwhile, Mrs. Collins and her family removed to St. Charles and were living there when Wilson returned to St. Louis in 1824. He was then married, in accordance with the forms provided for by the statute then in force, to Sarah Ann Adams, the owner of the property now in controversy. By this marriage a female child was born in 1826, who survived the mother, and died in 1827.

In 1830, after the death of Sarah Ann and her child, Wilson sent for Jane Collins, who was then in St. Charles, and he and Jane Collins afterwards lived together as man and wife, until his death in 1836, recognizing her as his wife and treating the daughter, Cynthia Elizabeth, as his child. After the death of Wilson, Cynthia Elizabeth married Abner W. Dyer, and the plaintiffs are the descendants of that marriage. Mrs. Dyer died July 13th, 1869, and her husband died June 25th, 1870. This ejectment was brought August 11th, 1872.

The instructions of the court to the jury in regard to these connections of Wilson, were as follows: "If you find from the evidence that in the year 1819, at the town of St. Louis, intending thereby to contract marriage, the said Wilson and one Jane Collins, agreed to live together thenceforward as man and wife, and that of the union thus

formed, Cynthia Elizabeth Wilson was born, and that she survived the said Wilson, then the title to the premises sued for became vested in said Cynthia, &c. But if you believe from the evidence that when they came together in 1819 the said Wilson and the said Jane did not intend to contract marriage, but merely intended to live together for purposes of illicit cohabitation, and of that intercourse said Cynthia was born, then upon the death of her father she did not become vested with the title to the premises sued for, unless you find from the evidence that subsequently to the birth of said Cynthia, and after the death of said Sarah Ann Adams, he (Wilson) and the said Jane Collins, intending thereby to intermarry, mutually agreed to live together thenceforward as man and wife, and did so live, and that after such reunion, the said Wilson recognized the said Cynthia as his child."

The statutes in regard to marriages, in force from 1819 to 1830, are as follows. The first act was passed by the Governor and Judges of Indiana Territory, on April 24th, 1805. So much of it as is important to the consideration of the question involved here, is in these words:

"1. All male persons of the age of seventeen years, and female persons of the age of fourteen years, and not prohibited by the laws of God, may be joined in marriage.

"2. It shall be lawful for any of the judges of the General Court or the County Court of Common Pleas, in their respective districts, ministers of any religious society or congregation within the district in which they are settled, and the society of Christians called Quakers, in their public meetings, to join together as husband and wife, all persons of the above description who may apply to them agreeably to the rules and usages of their respective societies to which the parties belong.

"3. Previously to persons being joined in marriage as aforesaid, the intention of the parties shall be made known by publishing the same for the space of fifteen days at least, either by the same being openly declared three

several Sundays, holy days, or other days of public worship in the meeting, in the town where the parties respectively belong, or by publication in writing under the hand and seal of one of the judges before mentioned, or of a justice of the peace, within the district, to be affixed in some public place of the town where the parties respectively dwell, or a license shall be obtained of the Governor under his hand and seal, authorizing the marriage of the parties without publication, as in this law before required."

An additional act was passed by the Legislature of the Territory of Indiana, approved July 9, 1806, which in no way repeals or limits the foregoing law, except that the third section is as follows:

"Sec. 3. From and after the passage of this act, it shall be lawful for any preacher of the gospel, magistrate, or regularly ordained clergyman, to perform the ceremony of marriage within the territory, to be certified and recorded, &c."

This remained the law of marriage in the territory until after the admission of Missouri into the Union, and until the first revision of 1825, when it was repealed, and a different regulation adopted and approved on the 4th day of January, 1825, and to take effect on the 4th day of July, 1825. Revised Statutes of 1825, p. 527.

By the first section it is provided as follows: "Be it enacted by the General Assembly of the State of Missouri, That every judge and justice of the peace of this State, and every stated and ordained minister and preacher of the gospel, shall be, and is authorized and empowered to perform the ceremony of marriage within this State, and all marriages heretofore solemnized by any of the said persons shall be deemed good and valid."

The remainder of the act provides for the mode of recording marriages, and creates the usual penalties for solemnizing marriage of infants, without consent of parents, &c. This law remained in force until the revision

of 1835, when it was somewhat modified, and the act was commenced by the following section :

" 1.    Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting, is essential."

The first question presented by these instructions of the circuit court on the trial, was decided by this court in the case of *Cargile et al. v. Wood et al.*, (63 Mo. 501.)    In that case the following instructions were given by the circuit court:    " The jury are instructed that marriage is a civil contract, and it is not necessary that the same shall be solemnized before a minister of the gospel, or an officer of law, and if you believe from the evidence, that at any time prior to the birth of the child Cynthia, Cargile and Cynthia Kilgore consented and agreed with each other to be husband and wife, and cohabited together as such husband and wife, then such facts constitute a lawful marriage, even though they or either of them supposed or believed that a solemnization before a minister or officer of the law was necessary to comply with the forms of the law, and no subsequent acts or declarations by them or either of them could in any wise annul such marriage ; and although the jury may believe from the evidence that Augustus Cargile and Cynthia Kilgore had first become intimate in the State of Georgia, and although they were not then married to each other when such intimacy occurred, still if you believe from all the evidence in this case that said Augustus Cargile brought said Cynthia out to Missouri, on or about 1854, and that subsequently they cohabited together here as man and wife, and during such cohabitation treated each other as man and wife and were so reputed, had children which they treated as father and mother, and held them to be their children, that they thus lived and cohabited together until their death in 1862, and at such death had the child Catherine, then living and about 8 or 12 months old, then the law presumes, and you have a right to infer that there had been a lawful

marriage between them prior to the birth of said child, Catherine."

· In the instructions given by the court, it is again asserted; "You are instructed that marriage is a civil contract, and in order to constitute a lawful marriage it is not necessary that the ceremony of marriage shall have been performed by a minister of the gospel or an officer authorized by law to perform such ceremony.".

It will be perceived' that these instructions, which were approved by this court, go further than the question involved in the present case requires to be considered, but the basis of all the propositions submitted to the jury was the assumption that under the law of this State a ceremonial marriage was not essential to its validity. Indeed, this proposition was not disputed on either side; and therefore was not discussed in the opinion of the court, but its correctness was essential to an affirmance of the judgment —for there was no pretense or shadow of proof in the case of any ceremonial marriage, at any time, and the marriage which the jury were authorized to presume was simply a marriage *per verba de praesenti*, or *per verba de futuro* followed by cohabitation.

The United States District Court for this State, in the case of *Holabird v. A. M. Insurance Co.*, ( 12 Am. Law Reg. N. S. 567; S. C. 2 Dill. C. C. 167,) appears to have adopted the same view of the law of this State. Judge Treat, in his instructions to the jury in that case, says : "It is not necessary to the validity of a marriage in Missouri, that any special ceremony, religious or otherwise, should be performed, nor that the marriage should be solemnized before any person belonging to any one of the classes named in the Missouri statute, as authorized to perform the ceremony. Marriage in Missouri may be had by the mutual consent of two competent persons, made in good faith and followed by cohabitation, without the addition of any prescribed formalities, and may be shown by such evidence as proves that such a marriage actually exists.

And such is substantially the law in Tennessee and Illinois. Therefore, if the jury believe from the evidence, that in the State of Missouri, Tennessee or Illinois, the plaintiff and Mr. Holabird agreed, by mutual consent, given in good faith, to become husband and wife, and cohabited as such thereafter, then from the date of such mutual consent, she was his wife."

In view of the importance of this question to the interests of society, and of the fact of a unanimous opinion of the Court of Appeals, directly in opposition to these views, it is proper that we should re-examine the authorities, both English and American, to see if the conclusion heretofore reached was arrived at hastily or inconsiderately.

The common law of England, in a modified form, was adopted by the Territorial Legislature of Missouri in 1816. So also were the statutes of the British Parliament in aid of the same, made prior to the fourth year of James I, provided that neither said common law nor statutes were inconsistent with the laws of this territory or with the constitution and laws of the United States, and were not local to the Kingdom of Great Britain. In England, prior to the Council of Trent, marriage was regarded in no other light than as a civil contract, and the law treated it as it did all other contracts, allowing it to be good and valid in all cases, where the parties at the time of making it, were, in the first place willing to contract, and secondly, able to contract, and lastly, actually did contract. Any contract made *per verba de praesenti*, or in words of the present tense, and in cases of cohabitation *per verba de futuro*, between persons able to contract, were, before the act of George II deemed a valid marriage. (1 Bl. Com., Ch. 15.) In *Jesson v. Collins*, (2 Salk. 438, 447,) Lord Chief Justice Holt says that a contract *per verba de praesenti*, was a marriage, and in the same case, reported in 6 Modern 155, he says that such a contract amounts to an actual marriage, as if it had been *in facie ecclesiae*—and in this, all the court agreed.

And in the *King v. Inhabitants of Brampton*, (10 East 282,) Lord Ellenborough, C. J., declares that before the marriage act the contract of marriage, *per verba de praesenti*, would have bound the parties.

It is true, that in the *Queen v. Millis*, (10 Clark and Fin. 682), it was maintained by the judges, that from the earliest times, long prior to the Council of Trent, the common law of England required to the constitution of a *full and complete marriage*, some religious solemnity; " that besides the civil contract, that is, the contract *per verba de praesenti*, which has always remained the same, there has at all times, been also a religious ceremony, which has not always remained the same, but has varied from time to time, according to the variations of the laws of the church ; with respect to which ceremony, it is to be observed, that whatever at any time has been held by the law of the church to be a sufficient religious ceremony of marriage, the same has, at all times, satisfied the common law of England in that respect."

It is evident that the common law of England, as thus expounded, was not understood to be the common law introduced into this Territory in 1816, but rather as it was declared by Sir Wm. Blackstone, in the extract we have made from his Commentaries, and by Ch. Kent, in his Commentaries (2 Vol., p. 86,) when treating of the same subject: " No peculiar ceremonies," says the author, " are requisite *by the common law* to the valid celebration of the marriage. The consent of the parties is all that is required by natural or public law. The Roman lawyers strongly inculcated the doctrine that the very foundation and essence of the contract consisted in consent, freely given by parties competent to contract. *Nihil proderit signasse tabulas, si mentem matrimonii non fuesse constabit. Nuptias, non concubitus, sed consensus facit.* This is the language equally of the common and canon law, and of common reason. If the contract be made *per verba de praesenti*, and remains without cohabitation, or if made *per verba de futu-*

*ro*, and be followed by consummation, it amounts to a valid marriage, in the absence of all civil regulations to the contrary, and which the parties (being competent as to age, and consent) cannot dissolve, and it is equally binding as if made *in facie ecclesiae.*

In Reeves' Domestic Relations, p. 196, it is observed that " there is nothing in the nature of a marriage contract that is more sacred than that of other contracts, that requires the interposition of a person in holy orders, or that it should be solemnized in a church. Every idea of this kind, entertained by any person, has arisen wholly from the usurpation of the church of Rome on the rights of the civilian. She claimed the absolute control of marriages, on the ground that marriage was a sacrament, and belonged wholly to the management of the clergy. The solemnization of a marriage by a clergyman was a thing never heard of among primitive christians, until Pope Innocent III, ordered it otherwise. The only ceremony in practice among them, was, for the man to go to the house where the woman dwelt, and, in the presence of witnesses, to lead her away to his own house. It is a pure civil transaction, to be solemnized in such a manner as the Legislature shall direct, whether by a clergyman or any other person. * * I apprehend that by the provisions of the common law, marriages, although celebrated by a person not qualified by law *or in a manner forbidden by law*, are valid. The conduct of the parties concerned, has rendered them obnoxious to the penalties of the law ; but such singular conduct is not a ground for impeaching the validity of the marriage. Until the civil wars, during the reign of Car. I, nothing can be found on this subject. For until that period, it had not been supposed that any person, but one in holy orders, could celebrate a marriage. The mode of pleading was *per presbyterum in sacris ordinibus constitutum.* After this period, and before the statute of George II, several cases may be found which will cast light on this subject. During the Commonwealth, the power of

celebrating marriages was given to justices of the peace, and they were the only officers whom the law recognized as possessing authority to marry. Yet, during the existence of this law it was determined that a marriage celebrated by one in holy orders, though not a justice of the peace, was valid. After the Restoration, the power of celebrating marriages was committed exclusively to the clergy of the church of England. And yet we find the Court of King's Bench issuing a prohibition to the spiritual court, because the validity of a marriage had in the face of a separate congregation, was questioned in said court. So, too, we find that a marriage by a preacher in a separate congregation, who was a layman, was recognized as valid; for, on the death of the husband, the wife and children were admitted to their distributive shares. * * * We find, also, that a marriage by a popish priest was held valid; and that, in the strongest possible case; the case was that a man had been married by a popish priest, who, by law, had no authority to marry."

Mr. Greenleaf, in his Treatise on Evidence, Vol. 2, p. 513, says: "Marriage is a civil contract, *jure gentium*, to the validity of which the consent of parties, able to contract, is all that is required by natural or public law. If the contract is made *per verba de praesenti*, though it is not consummated by cohabitation, or if it be made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage, in the absence of all civil regulations to the contrary. And though in most, if not in all the United States, there are statutes regulating the celebration of marriage, and inflicting penalties on all who disobey the regulations, yet it is generally considered that in the absence of any positive statute declaring that all marriages not celebrated in the prescribed manner, shall be absolutely void, or that none but certain magistrates or ministers shall solemnize a marriage, any marriage regularly made according to the common law, without observ-

ing the statutory regulations, would still be a valid marriage." .

Mr. Bishop, in his Treatise on Marriage and Divorce, declares that " the doctrine has become established that a marriage, good at the common law, is good, notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity. This rule applies not only to the statute as a whole, but to the several parts of it ; so that, if it declares the marriage void for non-compliance with a particular provision, it is good notwithstanding a failure to comply with any other provision. This rule, like most other rules now well settled, has struggled against some doubts and uncertainties, but it seems never (unless we except a Massachusetts decision, to which we shall presently refer) to have been discarded in actual adjudication." The exceptional case referred to is, *Milford v. Worcester*, (7 Mass. 48.) Passing from the textbooks, we proceed to refer to a few of the leading decisions in this country, referred to by Mr. Bishop, as supporting the position stated in the above quotation.

In the case of *Ferrie v. The Public Administrator*, (3 Bradf. 151) in the Surrogate Court in New York, a case elaborately discussed by eminent counsel, the learned Surrogate declared the following doctrine as the basis of his decision : " Marriage, in its origin, is a contract of natural law, and in civil society is a civil contract, requiring no forms or ceremony, unless imposed by the local law, and hence, when the law directs the ceremony to be conducted in a prescribed manner, a failure to comply with such forms does not affect the validity of the contract, *unless such effect be expressly declared by statute.*" This case was decided in 1855.

In *Dumaresly v. Fishly*, (3 A. K. Marshall 370,) decided in 1821, C. J. Boyle, said : " Marriage is nothing but a contract; and to render it valid, it is only necessary, upon the principles of natural law, that the parties should be able to contract, willing to contract, and should actually

contract.   A marriage thus made, without ceremony, was, according to the simplicity of the ancient common law, deemed valid to all purposes; and such continued to be the law of England until the time of Pope Innocent III, when the ceremony of celebrating marriage *in facie ecclesiae*, was first introduced into that country."

Judge Mills dissented in the case—but upon the ground that the common law of England was only adopted in Kentucky so far as it was compatible with the spirit of our government; and that the subjection of the English common law judges to the usurpations of ecclesiastical judicatures induced the doctrine that words alone, without cohabitation, constituted a marriage.   Thereupon, Judge Mills says:   " I would say that a marriage executed according to the forms of law, should be binding at all events, and that those made in other modes should require consummation, evidenced by cohabitation; while in those that exist in bare words, and which had the offer of consummation on one side and a refusal on the other, I would leave the *locus pœnitentiae* to the party rejected."

In *Hutchins v. Kimmell*, (31 Michigan 127,) decided in 1875, Judge Cooley declares it to be the law of Michigan, that where parties agree presently to take each other for husband and wife, whatever the form of ceremony, or if all ceremony be dispensed with, and from that time live together professedly in that relation, this constitutes a valid marriage.   And the judge adds:   "This has become the settled doctrine of the American courts; the few cases of dissent, or apparent dissent, being borne down by a great weight of authority in favor of the rule as we have stated it."   And the judge cites cases in New York, Pennsylvania, New Jersey, Vermont, Ohio, North Carolina, New Hampshire, Tennessee, Maryland, Alabama, Kentucky, California and Louisiana, in support of this position.

The case of *Londonderry v. Chester*, (2 N. H. 268,) was decided in 1820.   In that case, C. J. Woodbury, says: " The

form of the contract of marriage, as a mere civil transaction, is well enough established.  Thus, if it be *per verba in futuro*, the contract is executory, and if not afterwards executed, an action lies for damages alone, though formerly this kind of a contract was specifically enforced by ecclesiastical courts; and its existence was considered a good cause of a divorce.  But if the contract be *per verba de praesenti*, the marriage is complete ; and if the parties, being in other respects competent to contract, and not being influenced by fraud or force, employ such words, they become, by the operation of the contract alone, husband and wife, and are liable to the duties of their new relation."  And Judge Woodbury adds : " Under this view, the purity and sacredness of the marriage contract will remain no less, but rather more inviolate, than under a different construction.  For now the contract will never be annulled for any accidental or designed irregularity, not extending to the essential grounds of the contract. And it is a matter of deep concern to the public, that when a contract which changes so thoroughly the relations of the parties to the community, is first executed by them with deliberation and afterwards consummated by cohabitation, it should not be lightly dissolved, and everything done under it annulled."

*Pearson v. Howey*, (6 Halstead N. J. 17,) was decided in 1829.  In that case Judge Ford says : "The parties thus joined together were not related within any prohibited degree, nor under any disability for want of age or understanding.  They were free, able and willing, as it respected themselves, and they contracted marriage in words of the present tense, taking each other as husband and wife.  I consider it to have been long and fully settled in law that such is a valid marriage.  It is a maxim of the common law, as ancient as the law itself, that *consensus non concubitus facit nuptias*.  It is the contract makes the marriage.  Such, also, has always been the law or maxim of the church in all ages, as well as the common law.

Courts of justice are not authorized to alter the law, without legislative authority in any case, and most assuredly not in the case of such universal importance." Judge Ford proceeds to cite authorities from the ancient English adjudications, and then proceeds : "It was never held essential to the validity of the contract that it should be made in a particular place or in the presence of one person more than another, provided it could be sufficiently proved." * * "The common law requires nothing more of parties who are under no legal disability, than proof of a contract, made in words of the present time."

* * "But though the common law requires nothing more than a contract, still the proof of it is indispensably necessary, because if it cannot be proved it is the same as none, and will be treated as none, from whence arises the heavy obligation which parties lie under to themselves of solemnizing it before one or more competent and credible witnesses, such as parents, relations, friends or neighbors. * * But though the common law requires proof of the contract of marriage, it does not specify who shall be the witnesses, any more than who shall be in case of a will, a deed or a bond. * * W. H. was as competent to prove it as a magistrate, a clergyman, or religious society, according to the most established principles of the common law, which the constitution of this State makes the common law of the land, except so far as it may be repealed or altered from time to time by the Legislature. The question then is, whether the Legislature has ever repealed or altered the law of marriage. Now our whole statute book shows but one act concerning marriages, which is to be found in Rev. Laws 181, and it enacts 'that every justice of the peace of this State,' every 'stated and ordained minister of the gospel,' and ' every religious society according to its rules,' shall be empowered to solemnize marriages. This law *does not prohibit other persons* from solemnizing them, as they always had a right to do before the law was enacted.

It contains no express words of prohibition nor any implication to that effect. To solemnize means nothing more than to be present at a marriage contract, in order that it may have due publication, before a third person or persons, for the sake of notoriety and the certainty of its being made. To solemnize or celebrate means nothing more, and may be done before parents, friends or strangers, able to testify to the fact; but where there is only one witness, who may die at any moment, the parties incur an awful risk of losing the only evidence of the marriage, and thereby of bastardizing their innocent offspring, and of losing the great marital rights of protection and property. But in point of mere legal competency for witnessing or solemnizing a contract of marriage, the law has made no distinction of persons. Thus, justices of the peace, ministers of the gospel, religious societies, not only had the power like all other persons to witness and solemnize marriages, but they actually exercised this power, long before the present act was passed, which proves that they always had the right to do it at common law, and as this act gave them no new power so it took none away. But suppose this act had gone to the whole extent of declaring that no other person or persons should solemnize marriages, except those mentioned in it, such other persons would commit an offense against the act by solemnizing marriages, for which they might be punished, but still the marriage contract between the parties themselves would remain valid. During the Commonwealth of England, Parliament passed a law requiring all marriages to be solemnized by a justice of the peace, yet a marriage solemnized before a clergyman was holden by all their courts to be valid, as between the parties, though the clergyman was punishable. So the solemnization of marriage in England, before a popish priest, was always holden valid, as between the parties, though the statute prohibited such priest from doing it, and for the act he was exposed to puninshment. See the cases collected on this subject in Reeves' Dom. Rel., 198. Our

act empowers an ordained minister of the gospel to solemnize marriages; but suppose a minister of the gospel should do it before he is ordained, can any person believe that the marriage itself would be invalid, and that either of the parties might go away and any time afterwards contract new alliances? Our statute prohibits ministers of the gospel from solemnizing the marriage of persons under age, without the consent of parents or guardians, under a heavy penalty; but this does not render the marriage void; on the contrary, it remains sacred and inviolable, and is the very thing that aggravates the offense. What, then, it may be asked, was the public use of the act in question, if justices of the peace, clergymen and religious societies had power to solemnize marriages as well before the passing of it as since? I answer, that they were the persons who had been resorted to by almost all classes of society, as if by universal custom, to be witnesses of this solemnity, on account of the gravity and respectability of their characters, and one of the uses of this invaluable statute was, to compel them to make a record of all these marriages by certifying them into the clerk's office of the county, there to remain of record to future times, to effect the most public as well as private interests. * * The withering effects of declaring a marriage null and void, from the beginning have been sufficient to appall, not courts of justice only, but courts of the church, in all ages, where the parties had taken each other as husband and wife, by words of solemn contract in the present tense, in the presence of credible witness or witnesses, and the contract could be fully proved. The British Parliament have lately repealed their old common law, by prescribing the manner in which marriage shall be solemnized, and adding an express clause that marriage in any other form shall be void, but it is obnoxious to the country, to the wisest and best and most virtuous men among them, as well, it would seem, as to their courts of justice, and it is yet a problem whether they will not connive at the evasion of it."

It will be observed that the above was the opinion of Judge Ford alone, the other judges not expressing any dissent thereto, but declining to express any opinion, except upon the precise point involved in the case, which was the validity of a marriage solemnized by a justice of the peace, outside of his territorial jurisdiction. But I have copied largely from Judge Ford's opinion, because it is frequently referred to with approbation, not only in textbooks, but in subsequent adjudications, as an able discussion of the subject.

The case of *Rodebaugh v. Sanks*, (2 Watts 11), was decided in 1833. C. J. Gibson in that case, observes: "Many provisions in the act of 1700 and 1729, though doubtless wholesome when they were enacted, are ill-adapted to the habits and customs of society as they now exist. It is not too much too say, that a rigid execution of them would bastardize a vast majority of the children which have been born in the State for half a century, for if the clause which requires that 'all marriages' shall be solemnized by taking each other to husband and wife before 'twelve witnesses,' were taken according to its natural import for a declaration of what shall be a legal marriage and what not, it would follow that a marriage contracted in any other form or way, is void. To escape from a conclusion imputative of guilt to the parties and destructive of the civil rights of their offspring, it is necessary to hold not only this clause, but those which require a certificate of marriage under the hands of the parties and the twelve witnesses, to be registered in the proper office, as well as publication of banns by posting on the church or court-house doors, with other matters fallen into disuse, to be but directory."

In 1845, in the Court of Quarter Sessions at Philadelphia (*Nathan's case*, 2 Brewster 149,) Judge Parsons says: "It seems to be clearly settled in the United States, that marriage is but a civil contract, and it is not necessary that a clergyman or magistate should be present to give validity to the marriage; and if the contract be made *per*

*verba de praesenti*, and remains without cohabitation, or if made *per verba de futuro*, and is followed by consummation it amounts to a valid marriage, which the parties, being competent as to age and consent, cannot dissolve, and is equally binding as if made *in facie ecclesiae*. The question has been very fully considered by the Supreme Court of this State, and held to be the law here, that marriage is a civil contract, which may be completed by any words in the present tense, without regard to form, nor is it absolutely necessay to be done before a clergyman or a magistrate."

In *Richard v. Brehm*, (23 P. F. Smith 140,) decided by the Supreme Court of Pennsylvania in 1873, Mercur, J., observed: "Marriage is a civil contract, *jure gentium*, to the validity of which the consent of parties, able to contract, is all that is required by natural or public law. If the contract is made *per verba de praesenti*, though it is not consummated by cohabitation, or if it be made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage, in the absence of all civil regulations to the contrary. The fact of marriage may be proved by competent and satisfactory evidence. * * Marriage is in law, a civil contract, not requiring any particular form of solemnization before officers of church or State."

The case of *Bissel v. Bissel*, (55 Barb. 326,) was decided in 1869. It is there said: "It is well settled, that no religious ceremony, or form of any description, is essential to the validity of marriage. All that is requisite is, that the parties should be capable of contracting, and that they should actually contract to be husband and wife. A mere agreement to marry at some future time, followed by cohabitation, will not constitute a marriage, but an agreement, made in the present tense, whereby the parties assume towards each other the marital relation, is an actual marriage. This agreement may be written or verbal, with or without witnesses, and may be proved like any

other contract; when proved to the satisfaction of a court of justice, it constitutes a lawful marriage."

The case of *Newberry v. Brunswick*, (2 Vt. 159), was decided in 1829. Paddock, J., delivered the opinion of the court, a part of which is as follows: " To marry is one of the rights of human nature, instituted in a state of innocence for the protection thereof, and was ordained by the great Lawgiver of the universe, and¹ not to be prohibited by man. Yet human forms and regulations are necessary for the safety and security of the community; but those forms and regulations are to be within the reach of every person wishing to use them; and if they are not, other forms and customs will be substituted; and such was the case in this instance. Before the days of Pope Innocent III, solemnization of marriages in churches was not known. After the agreement to cohabit, the man led the woman to his habitation, which was all the ceremony then in use. * * * It must, however, be admitted, that great convenience is experienced from the celebration of marriages before constituted authorities, for it not only furnishes proof of the best description, but the preservation of it is directed by statute, and easily attained when needed. But the law, treating the marriage agreement of the parties as the marriage, regulating only the manner and form of celebrating it and preserving the evidence thereof, admits proof other than the copy of the registry or record of the magistrate or witnesses—the declaration of the man or woman, the continued understanding of friends, and cohabitation as evidence of the fact—and as neither our statute (nor that of 26 George II) declares that marriage was void which was not consummated according to the provisions of them, no sound reason can be offered why the covenants and agreements of marriage between H. and P. *per verba de praesenti*, followed by cohabitation, should not be deemed as valid, to every intent, as though made before the altar, specially as it is viewed both in this State and in England, in no other light than as a civil contract."

The case of *Holmes v. Holmes*, (6 La. O. S. 463) was decided in 1833. In that case, Judge Bullard says : " Marriage is regarded by our law in no other light than as a civil contract, highly favored and depending essentially on the free consent of the parties capable by law of contracting. Our code does not declare null a marriage not preceded by a license, and not evidenced by an act signed by a certain number of witnesses and the parties ; nor does it make such an act exclusive evidence of the marriage. These laws relating to forms and ceremonies, here regarded as directory to those alone who are authorized to celebrate marriages, are intended to guard against hasty and inconsiderate marriages in defiance of parental authority. Like all other contracts, it may be proved by any species of evidence not prohibited by law, which does not pre-suppose a higher species of evidence within the power of the party."

The case of *Campbell's Admr. v. Gullat* (43 Ala. 57,) was decided in 1869. The Alabama statute resembled the Missouri statute, except that it declared positively " that no marriage shall be solemnized without a license issued by the judge of probate of the county where the female resides;" yet the court held in that case as follows : " Such laws do not declare marriages, not solemnized in accordance with their provisions, invalid. We, therefore, do not feel authorized to do what the laws themselves have not done, but we hold that in this State, a marriage not celebrated in conformity with the said laws on marriages, that is, celebrated without a license issued by a judge of probate, or not by any one of the persons or religious societies named in such law, or without complying with other provisions of said law, is not to be declared invalid, provided the requirements of the common law have been substantially complied with; in other words, that a marriage good at the common law is a valid marriage in this State."

In *Hargroves, Admr. v. Thompson*, (31 Miss. 211,) decided in 1856, Hardy, J., observed : " There is nothing in the statutes of Mississippi directly rendering mar-

riages, conducted without the observance of the rule therein prescribed, illegal and void, and the rule which has been sanctioned in reference to marriages not solemnized according to statutory regulations is, that even prohibitory words in a marriage act will not authorize an inference of the nullity of the marriage, unless the nullity is declared by the act, and although persons who may violate the forms required by the statutes in solemnizing marriages, may be liable to the penalties provided for the non-compliance, yet marriages contracted without a conformity to such regulations are generally held to be valid, if made between parties capable by the common law of contracting them, unless the statutes positively declare that marriages not conducted in conformity with their provisions shall be void. We think this is the proper construction to be given to our statutes on this subject, which appear to be similar in their provisions to the statutes of other States in which this construction has been adoped."

In *Carmichael v. The State*, (12 Ohio St. 553,) it was held that where parties openly and mutually covenanted to a contract of present marriage—then to become husband and wife—and thereafter cohabited as such, it was a legal marriage, and the man was liable to prosecution for bigamy, if he had been married before and his wife was still living.

In *Graham v. Bennet*, (2 Cal. 503,) decided in 1852, the same doctrine is asserted. In Tennessee, (see *Bashaw v. The State*, 1 Yerger 183) the statute required a publication of banns or a license from under the hand and seal of the Governor, and enacted " that all marriages solemnized as aforesaid, without such license first had, *shall be and are hereby declared illegal and void*." And the court held (Peck, J., dissenting) that a marriage celebrated without a license or without publication of bans, was void. This act was passed in 1766, and before the separation from North Carolina. Hence, the decision in North Carolina in 6 Iredell 23, *State v. Robbins*. So that, as far as I have

been able to discover, the only decision in the United States conflicting with the general doctrine stated by Mr. Bishop, is the case in 7th Massachusetts Reports heretofore referred to.

These extracts are probably sufficient to show the general current of American authority, and would seem to justify our conclusion, *stare super antiquas vias*. Our statutes are essentially like those of the States from whose courts opinions have been quoted, and in some respects less stringent than many others. There is, at all events, no positive declaration in our statute that a marriage not celebrated or solemnized before a magistrate or minister of the gospel, shall be void. It will not be understood that we assent to all the positions assumed by those judges and writers from whom we have quoted; we merely conclude from these authorities, as well as upon general principles and public policy, that the instructions of the circuit judge were correct. Nothing is said in these instructions as to the efficacy of a promise to marry at some future time; nothing is declared as to the value of a promise *in verba de praesenti*, unless followed by cohabitation, and unless the parties intended a present marriage. If an affirmative response was given by the jury to the question propounded by the court, there was a contract of present marriage—openly made before the mother and brothers of the woman, and several strangers to the family—followed by cohabitation as husband and wife. That the husband, in pursuing his avocation, determined to join Major Long's exploration party to the Rocky Mountains, could hardly be regarded as a very strong proof of predetermined bad faith, nor his subsequent marriage, five years afterwards. These were matters, however, for the jury to pass on. The jury were required to find that the parties contemplated no further ceremony to completely constitute the conjugal relation between them, and that they, at the time they stood up with joined hands, on the floor of Mrs.

Collins' boarding house, intended to become and believed that they had become husband and wife.

We will not be understood as giving any opinion in regard to a contract of marriage *in verba de futuro*, followed by cohabitation, since the facts in the present case require none on that question.   (10 Ohio St. 181).

Assuming the marriage of 1819 to have been valid, or that in the event that the jury found it invalid, under the 2. UNLAWFUL MAR- instruction, and that of 1830 to have been RIAGE: inherita- valid, the only remaining question connected ble capacity of is- sue. with this branch of the subject, is the propriety of the declaration by the court that in either event, the father (Wilson) could inherit from his child by Sarah Ann Adams.

Prior to the act of January 11th, 1822, (Ter. L., p. 857), our statutes of Descents and Distributions had been very complicated, and were filled with detailed provisions aiming to keep the estate in the blood of the first purchaser. This act abandoned all provisions of that character, was very simple, and, in fact, substantially our present law. It provided also that the issue of all marriages, deemed null in law or dissolved by divorce, should, nevertheless, be legitimate. All the statutes concerning divorce and alimony, from 1807 down to this time, (1822,) and subsequently to 1825, had made the same declaration in regard to divorces, namely, that divorces should not affect the legitimacy of the issue. In 1825, however, a singular clause was inserted at the end of the section providing for divorces, and declaring the issue legitimate, "except in cases where the marriage shall be declared null and void from the beginning, on the ground of prior marriage." How to reconcile this exception with the provision in the act concerning descent and distributions, that the issue of marriages deemed null in law, should, nevertheless, be legitimate, was a problem presented to this court in 1834, in the case of *Lincecum v. Lincecum*, (3 Mo. 441). The court, however, without undertaking to explain its object, which

would have been a difficult task, decided that at all events it did not repeal or modify the contrary provision in the act of descents and distributions. And the Legislature, in the fall of that year, (Revising Session of 1834–35,) evidently agreeing with the construction of the court, and seeing the folly of the proviso, struck it out of the act of 1834-5, and it has so remained ever since.

The second marriage of Wilson being null in law (on the assumption that the marriage of 1819 was valid) the child of that marriage, beyond doubt, inherited the estate in controversy, from her mother, and if she had been a legitimate child, not only *de jure* but *de facto*, would unquestionably, on her death, without issue and without brothers or sisters, have transmitted the estate to the father. It is, however, contended that the legitimacy thus imparted to the child by law, whilst it would enable her to take either from her mother or father, and to transmit the inheritance to descendants, must be so restricted as not to allow her to transmit the estate to ascendants, especially not to the guilty father. No such restriction is found in the law. The act simply declares the child legitimate, and the same act provides for the transmission of the estate on specified contingencies, from the child to the father. It is in the act regulating Descents and Distributions, that this section concerning the legitimacy of the issue of null marriages, is found, and it is for the purposes of this act that the declaration is made. We have no authority, upon grounds of public policy or for the promotion of private morals, to make restrictions or exceptions which the Legislature has not seen proper to make.

The instruction in regard to the marriage in 1830, in the event that no marriage was found by the jury in 1819, is based upon another provision of our act concerning Descents and Distributions in 1822, which declares that " when a man having, by a woman, one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him as his, shall be thereby

legitimated." Upon the principles heretofore maintained, there can be no question of the propriety of this instruction. In regard to the statute of limitations, the instructions of the circuit court were as follows:

"Upon this branch of the case, you are instructed that a party who acquires title under the statute by continuous possession adverse to the true owner, acquires all the title of such owner, precisely as if the possessor had received a deed from such owner. But, in order to give title under the statute, the possession must have been had during the period limited by statute, which has elapsed since a right of action accrued to the real owner, and must have been adverse, open, notorious, continuous and under a claim of title. And you are instructed further, that the statute begins to run in favor of one in possession of real estate as against the true owner, only from the time when such possession becomes adverse to such owner, and that when such owner is a married woman, and she acquires a right of action during coverture, the statute does not begin to run against her until the disability of coverture has ceased, and that she, and those claiming under her, have three years after the termination of such disability within which to sue for possession unless the occupant has been in possession, openly, notoriously, continously and adversely, for the term of twenty-four years next before the commencement of such suit. Hence, if you believe from the evidence, that, at the time when, either in person or through their tenants, the defendant, or those under whom he holds, entered into possession of the premises sued for, Cynthia E. Dyer, was a married woman, that she remained a married woman until her death; that within three years after such death, this suit was brought, and that the defendant, and those under whom he holds, had been in possession of the premises sued for during a period of less than twenty-four years next before this suit, then the plaintiffs are entitled to recover, and you will return a verdict accordingly.

3. STATUTE OF LIMITATIONS.

But, on the other hand, if you believe from the evidence, that, at the time when this suit was brought, more than three years had elapsed from the death of said Cynthia, and that the defendant, and those under whom he holds, either through themselves or by their tenants, had been in possession of the premises sued for during a period of ten years or more, next before such suit, that such possession was adverse to all others, open, notorious, continuous and under claim of title, then the plaintiffs cannot recover, and you will find for the defendant. For the purpose of determining whether there has been a claim of title on the part of the defendant, and those under whom he holds, you may have reference to the deeds read in evidence on his part, but such deeds are evidence before you for no other purpose. If you believe, from the evidence, that under such claim of title the parties, under whom defendant holds, either by themselves or by their tenants, took possession of a portion of the tract of which the premises sued for formed a part, asserting the title to the whole tract, and exercising acts of ownership over such tract, either by maintaining fences upon or paying taxes upon the same, then the actual possession of such part was possession of the whole for the purpose of this defense; and you are instructed further, that if you find that the possession of the defendant, and those under whom he claims, was adverse, open, notorious and continuous, as before indicated, then the bar of the statute will prevent a recovery, even if the plaintiffs, and those under whom they claim, had no actual knowledge of such occupancy by the defendant, and those under whom he claims title. If you find for the plaintiffs, you will find that they are entitled to the possession of lots 10, 11, 12 and 13, of block 1, of Darby's addition to the city of St. Louis, those lots being the only part of the tract sued for of which defendant has been shown to be in possession, and you will, if you so find for plaintiffs, assess their damages at the sum of one cent

and find the value of the monthly rents and profits to be nothing."

The objection to this instruction, is that the tenancy by the courtesy of A. W. Dyer, consummate on the death of his wife, is entirely overlooked. Mrs. Dyer died in 1869 before the bar of 24 years had elapsed. Her estate, not having been barred by the statute of limitations, on her death passed to her heirs. Her heirs, however, could not sue on her death, because her husband survived her, and they had no right of entry or action during his life estate. If the statute of limitations is construed to run against them from the death of the mother, it operated against parties who had no right of action, and who would have been trespassers had they undertaken to enter. Indeed, upon this construction of our statute, had the husband lived three years or more after the death of his wife, the title of the heirs would be totally destroyed, since they cannot sue during the continuance of the particular estate, and before its termination, the three years from the death of the mother have gone by. This would be the result, whether the husband, during the life of the wife, had transferred his estate to some third person by deed, or it had passed to an adverse possessor. *McCorry v. King's heirs*, 3 Humph. 267. So long as he lived, his life tenancy, whether outstanding in a third person or remaining in him effectually prevents any action or entry by the heirs. And thus, if the construction of our statute of limitations given by the circuit court, be correct, the estate of the wife, though not barred during her life, and passing on her death to her heirs, virtually ends with her life.

It is generally understood that the statute of limitations does not run against any one who has no right of possession. Cumulative disabilities are not allowed, or if the 24 years bar had destroyed the estate of the wife of A. W. Dyer, that was an end of the case. The statute, it is true, says nothing of the intervention of a particular estate between the death of the *femme covert* and her heirs, but

its operation is necessarily suspended until the expiration of the particular estate gave the heirs a right of entry. The person barred by the statute is one whose right of entry has accrued, and who neglects to sue during the three years allowed after his right of action accrues.

This view of the statute of limitations, differing from ours only in the extent of time required to form a bar, is that taken by the Supreme Court of Pennsylvania in *Marple v. Myers*, (12 Pa. St. 122,) and conforms to the opinion also in New York, in *Jackson v. Johnson*, 3 Cowen 92, and of C. J. Hosmer, in *Clark v. Vaughn*, 3 Conn. 191.

This view of the statute practically disposes of the case so far as the statute of limitations is concerned. Whether in the event the suit had not been brought within three years of the death of the husband, the heirs would have been barred by an adverse possession of ten or thirteen years, as was held by the Court of Appeals, is of no practical importance in the case. It is unnecessary to give an opinion on this question until such a case arises.

The judgment of the Court of Appeals is reversed, and the case remanded to the circuit court. The other judges concur.

REVERSED.

HOUGH, J., CONCURRING.—I concur in reversing the judgment and remanding the cause. I adhere to the views expressed by me in the case of *Valle v. Obenhouse*, 62 Mo. 81; so that if there, was an uninterrupted adverse occupancy of the land in question, beginning after the birth of issue, and continuing for the period of twenty-four years, neither Mrs Dyer nor her heirs would have been barred thereby. Whatever may have been Mrs. Dyer's rights prior to the birth of issue, most certainly, after the birth of issue, she was not entitled to possession, and therefore as there was no merger of the husband's estate, neither she, nor her heirs could have any right of action until the husband's estate was determined by his death. As Mrs.

Dyer died before her husband, and as no right of entry could accrue to her by reason of an adverse possession begun after the birth of issue, her children are not limited to three years after her death, as provided by Sec. 6, Art. 2, Chap. 89, Wag. Stat., but are entitled if *sui juris*, to ten years after their right of action accrued, which was on the death of their father, and not before.